Filed 6/15/23; Certified for Publication 7/5/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>BRANDON MICHAEL GAINES,<br><br>    Defendant and Appellant. | F083168<br><br>(Super. Ct. No. BF182466A)<br><br><br>**OPINION** |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DONTAY LARRY ROSS,<br><br>    Defendant and Appellant. | F083228<br><br>(Super. Ct. No. BF182466B) |

APPEALS from judgments of the Superior Court of Kern County. John R. Brownlee, Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Brandon Michael Gaines.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant Dontay Larry Ross.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendants Brandon Michael Gaines and Dontay Larry Ross were making a purchase at a convenience store where they exchanged words with a man who was accompanied by his girlfriend and her two young children. A short time after leaving the store, Gaines stopped his vehicle in the street near where the man, girlfriend, and children were walking on the sidewalk while Ross exited the vehicle and shot at the individuals multiple times. Defendants were convicted of premeditated attempted murder and related charges and were sentenced to terms of seven years to life, plus 10 years (as to Gaines) and seven years to life, plus 49 years and eight months (as to Ross).

Defendants challenge their convictions for discharging a firearm from a vehicle and permitting someone to discharge a firearm from a vehicle because Ross was not in the vehicle when the shooting occurred. Gaines also challenges his conviction of accessory to attempted murder based upon his act of driving Ross from the shooting because, he argues, it is based upon the same acts as aiding abetting the attempted murder and assault charges. Ross argues the evidence is insufficient to sustain his conviction for criminal threats because the statement that accompanied the shooting, "Fuck you and your kids," could not be considered a threat and the only evidence of the statement was the victim's out-of-court statement admitted after that victim testified that no such statement had been made. Ross also challenges his conviction for attempted murder and argues that the evidence was insufficient to demonstrate an intent to kill. Defendants argue that recent amendments to the sentencing law require we remand their cases for resentencing. Ross also argues that remand for resentencing is required because the trial

2.

court imposed fines, fees, and assessments without first determining whether he had the ability to pay.

The People respond that discharging or permitting someone to discharge a firearm from a vehicle does not require that the shooting occur from within the vehicle, that Gaines's conviction for accessory to a crime relied upon Gaines's conduct after the crimes had ended, and that the evidence was sufficient to support Ross's conviction for threatening to commit a crime and attempted murder. The People concede, however, that the recent amendments to the sentencing laws are fully retroactive to both Gaines and Ross and that their cases should be remanded for resentencing. We accept that concession but otherwise affirm the judgments.

## PROCEDURAL BACKGROUND

The District Attorney of Kern County filed an amended information on January 19, 2021, charging defendants with attempted premeditated murder (Pen. Code, §§ 664, subd. (e), 187, subd. (a), 189;[1] count 1), assault with a semiautomatic firearm (§ 245, subd. (b); counts 2–5), and discharging a firearm at an inhabited dwelling (§ 246; count 6). Gaines was also charged with permitting a person to discharge a firearm from a vehicle he drove (§ 26100, subd. (b); count 9) and aiding another to avoid or escape arrest (§ 32; count 10). The amended information also charged Ross with discharging a firearm from a motor vehicle (§ 26100, subd. (c); count 7), threatening to commit a crime (§ 422; count 8), and alleged Ross personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) as to count 1 and personally used of a firearm (§ 12022.5, subd. (a)) as to counts 2 through 6 and 8.

A jury convicted defendants of all charges after a 10-day trial on April 20, 2021, found true that the attempted murder was premeditated and deliberate, and found true all firearm allegations as to Ross.

---

**1**    Undesignated statutory references are to the Penal Code.

The trial court sentenced defendants on August 11, 2021. Gaines received a total term of seven years to life in prison, plus 10 years as follows: seven years to life in prison as to count 1 (§§ 664, subd. (e), 187, subd. (a), 189); a consecutive middle term of six years as to count 3 (§ 245, subd. (b)); two consecutive two-year terms as to counts 4 and 5 (one-third of the middle term per § 245, subd. (b)); and stayed middle terms of six years as to count 2 (§ 245, subd. (b)), five years as to count 6 (§ 246), and two years as to counts 9 and 10 (§§ 26100, subd. (b), 32).[2]

Ross received a total term of seven years to life in prison, plus 49 years and eight months as follows: seven years to life in prison, plus 20 years (§ 12022.53, subd. (c)) and a stayed five-year term (§ 12022.5, subd. (a)) as to count 1 (§§ 664, subd. (e), 187, subd. (a), 189); a consecutive upper term of nine years, plus 10 years (§ 12022.5, subd. (a)) as to count 3 (§ 245, subd. (b)); two consecutive two-year terms (one-third of the middle term per § 245, subd. (b)), plus three years and four months (one-third of the middle term per § 12022.5, subd. (a)) as to counts 4 and 5; and stayed upper of terms of nine years, plus 10 years (§ 12022.5, subd. (a)) as to count 2 (§ 245, subd. (b)), seven years, plus 10 years (§ 12022.5, subd. (a)) as to count 6 (§§ 246), seven years as to count 7 (§ 26100, subd. (c)), and three years, plus 10 years (§ 12022.5, subd. (a)) as to count 8 (§ 422).

The court also ordered that defendants each pay a $300 restitution fine, (former § 1202.4, subd. (d)), a $300 parole revocation restitution fine (§ 1202.45), victim restitution (former § 1202.4, subd. (f)), $240 in criminal conviction assessments (Gov. Code, § 70373), and $320 in court operations assessments (§ 1465.8).

Gaines and Ross filed timely notices of appeal on August 11 and August 20, 2021, respectively.

---

[2]    The trial court also imposed concurrent sentences in two unrelated cases for violations of probation.

# FACTS

In September 2020, T.J. was residing in a motel in Bakersfield with her boyfriend, R.D., and her children who were two and four years old. On the morning of September 6, 2020, T.J., R.D., and the children (collectively, "the victims") walked to nearby convenience stores to purchase food and drink. T.J. testified that R.D. used methamphetamine before they left.

At the second convenience store (the store) they went into, T.J. saw Gaines and Ross standing at the cashier's desk. T.J. had previously seen Gaines at another motel where she stayed but did not know either defendant. R.D. recognized Gaines and Ross from another motel where he and T.J. previously stayed. At that time, R.D. did not appear to have any problems with Gaines.

T.J. testified that as they all left the store, R.D. had an issue with Ross and "was going off on him. They were going back and forth."[3] She did not recall later telling police that one of the defendants had said something inappropriate to her and testified that defendants did not speak to her. Defendants were getting into a white Toyota Camry (the vehicle) when R.D. "was getting at [Ross]," who was a passenger in the vehicle. As defendants were driving away, R.D. chased them and acted as though he had a weapon in his pocket. As they left, Ross said that he and Gaines would be back. T.J. told a defense investigator that R.D. instigated the fight and might have acted like he had a weapon in his pants as he tried to intimidate defendants.

Kern County Sheriff's Deputy Gabriel Romo testified that he retrieved surveillance video from the store. Defendants entered the store at 9:40 a.m. The victims entered the store at 9:42 a.m. The video showed defendants leaving the store, approaching the vehicle, and driving away at approximately 9:45 a.m. Romo obtained

---

[3] T.J. used the wrong name to identify Ross, referring to him by Brandon, Gaines's first name, but this was later clarified when she identified Ross in the courtroom.

the license plate of the vehicle from the video and determined that it was registered to Gaines.[4]

Because defendants had driven in the direction of the victims' motel, they walked an alternate route back to the motel through an alley (to avoid defendants) that took them through an apartment complex located one street over from the motel. They turned right at the end of the alley and walked on the sidewalk in front of the apartments. T.J. estimated the walk took 30 minutes.[5]

T.J. saw the vehicle parked north of her location and on the opposite side of the street, in front of a church located across from the apartments. The vehicle moved forward as R.D. pretended to be on the phone calling the police.

The vehicle started moving as the victims turned onto the street, and T.J. believed that its occupants saw them. The vehicle then pulled into the wrong lane and stopped in front of the area where she and the children were standing. T.J. estimated that they were standing five to 10 feet from the street. T.J. identified Gaines as the driver of the vehicle and Ross as the front-seat passenger. Ross opened the vehicle's door, got out, stood behind the vehicle holding a black gun, and started shooting at the victims. T.J. testified, that Ross "got out of the [vehicle], but he didn't shut the [vehicle] or nothing. He just got out and started shooting." She and the children ran when Ross got out of the vehicle. She estimated that she heard 15 to 20 gunshots. R.D. ran past T.J. and the children through the complex and toward the motel, leaving them behind. T.J. took the children to one of the apartments to obtain help.

T.J. talked to police after the shooting and initially denied that R.D. had been present. However, she later gave them his name. At the time of the trial, T.J. and R.D. were no longer together and T.J. was in custody because she failed to appear for earlier

---

[4]    When Gaines was arrested on September 14, 2020, he was in possession of the vehicle.

[5]    Romo testified that he was dispatched to the location at approximately 10:00 a.m., indicating that the victims arrived at the apartments earlier than T.J. estimated.

court proceedings. In response to defense counsel's questioning, T.J. acknowledged that Gaines did not do anything that day but drive the vehicle.

R.D. testified that he had smoked and taken drugs the morning of the incident.[6] He and T.J. had walked to the store where he saw a black man and a white man inside. However, R.D. denied that any harsh words were exchanged. R.D. walked with T.J. and the children back to the motel and took a different route in order to give the children a walk. While in front of the apartment complex, someone shot at them. R.D. testified that he "tucked away" T.J. and the children when the shooting began and then returned to the motel. R.D. testified that he did not remember any details of the shooting nor any statements he made to police afterwards. He also testified that he did not see defendants at the store and they were not the individuals who shot at him.

Officer Edgar Davalos interviewed R.D., who provided a false name, the morning of the shooting and recorded the interview using his body camera. R.D. had discarded a knife in the motel parking lot and told Davalos that he had found it on the ground as he ran back to the motel and picked it up because he thought the shooters might follow him. He then explained that he was walking in front of the apartments when he got jumped and heard gunshots. R.D. said, "When we heard the shot, I pushed [T.J. and the children] towards this way and ran—we all ran this way." "I looked back and I didn't see [the shooter] but I heard [T.J.] screaming, 'my kids.' "

R.D. told Davalos that he did not see the shooters and it could have been anyone. R.D. then said that he was not a snitch but would describe what happened because "[t]hey shoot (unintelligible) my kids." R.D. described two men, one African-American and one Caucasian, from the store with whom he had exchanged words. R.D. explained to Davalos that while at the store, one of the men had said something to T.J. and he asked the man, "What the fuck you say to her?" Later in the interview, R.D. explained that

---

**6** R.D. testified that he had previously been convicted of felony domestic violence, felony criminal threats, and misdemeanor obstructing an officer.

after he confronted "the black dude" at the store, that man called to R.D. in the store parking lot through the vehicle's window and then sped off. R.D. decided to walk a different route back to the motel.

As they walked, the two men pulled their vehicle over and R.D. could see that they were now wearing masks, which alarmed him, and he then "push[ed] my kids towards the fuckin' apartment, run. That's all I got to tell my kids and my wife, run. By the time I turn around to what they gonna do, they already hopped out and fired." While R.D. described the driver to Davalos, he claimed that he did not see "the black dude" firing the gun and reiterated, "I am not no snitch."

As he walked from the alley later, R.D. saw the vehicle and described that he had stopped to spank his daughter when the vehicle started to move. He pushed his daughter toward T.J. and tried to pretend he was on the phone with police as the individuals pulled up behind a parked car near them. R.D. explained, "We pull up right here, and dude hops out with a mask and he said, 'Fuck you and your kids.' The [black man] said, "Fuck you and your kids, bro. And he—he just—he just started firing so …." "He's … firing like this, boom, boom, but he's advancing." R.D. later stated, "He said it before he started shooting, 'Fuck you and your kids.' So [he] wanted to hit me or my kids." R.D. saw bullets hit walls and grass, and he heard 15 to 20 gunshots.

Davalos testified that R.D. said that he recognized the Caucasian individual from another motel and that he had previously seen the African-American man in the parking lot of the motel where he was staying.

Kern County Sheriff's Deputy Rebekah Karr responded to the area after the shooting at approximately 10:15 a.m. She recovered 10 Winchester Luger nine-millimeter shell casings from the middle of the street. The casings were positioned in the street directly in front of the walkway between two apartment buildings.

The apartment complex consisted of four different clusters of buildings on the east side of the street. Officers searched the area and looked for any bullet strikes on the

buildings. Six bullet strikes were found. Bullet strikes on the first building included two found close to a second-story window and one on an air conditioning unit behind bushes alongside the building. The closest bullet strikes were located approximately 25 to 30 feet from the shell casings. Additional bullet strikes were observed on a building further east into the apartment complex and behind the building where the other strikes were found. The bullet strikes found in the first building were approximately eight or nine feet above the ground. Bullet strikes in the second building were approximately fifteen feet from the ground. The shooter could have caused the bullet strikes without leaving the vehicle or walking down the walkway. An evidence technician testified that a person close to the street would have been in the bullets' paths even though the bullets ultimately struck objects over the heads of the intended targets.

Sometime after 10:00 a.m., Pastor Tyler Barksdale was teaching a small group of congregants outside, approximately 125 yards from the street, when the shooting occurred. He had an unobstructed view of the street. While facing the apartments, he heard seven to nine gunshots, looked up, and saw "puffs of smoke" and someone standing in the street outside a vehicle and firing east toward the apartment complex. Barksdale described the shooter as a young, African-American man. After firing the gun, the shooter got into the passenger side of a white Corolla or Camry vehicle that he had been standing near. Barksdale described the vehicle as either in the middle of the street or in the wrong lane (facing south in the northbound lane). Barksdale could not recall if the vehicle's door was open during the shooting and did not see any other individuals, but he was only paying attention to the shooter and the vehicle. Barksdale identified the firearm as a semiautomatic pistol based upon the sound of the gunshots.

A congregant testified that she was outside the church conversing when she heard the gunshots. She turned and saw smoke and "something white" that she later concluded was a vehicle. The congregant told a deputy that she saw an adult male standing next to a white vehicle in the street.

9.

Approximately one month after the shooting, deputies served a search warrant at Ross's mother's residence where Ross had been living for two months. In Ross's mother's bedroom, they found her Springfield nine-millimeter firearm in a black box with a magazine loaded with 10 Luger nine-millimeter bullets and an additional magazine loaded with 10 rounds of .35-millimeter bullets. A box of nine-millimeter Blazer ammunition was found in her closet. In Ross's bedroom, detectives seized various calibers of ammunition and several bullet casings, including nine-millimeter casings. A detective obtained DNA samples from Ross and Gaines and requested that the firearm and ammunition be tested for DNA evidence. A Kern County criminalist obtained DNA samples from the firearm, the magazine found in the firearm, and the additional magazine found outside the firearm. Ross's DNA profile could not be excluded as being the same as the DNA sample taken from the empty magazine, and he was a contributor to the DNA profiles obtained from the firearm and from the second magazine. Gaines's DNA profile was excluded from contributing to the DNA samples.

Ross's defense counsel presented evidence that Ross had stayed at the same motel as T.J. and R.D. between September 4 and 6, 2020, and checked out at approximately 10:00 a.m.

## DISCUSSION

I.   **The evidence was sufficient to support defendants' convictions for discharging a firearm from a vehicle and permitting another person to discharge a firearm from a vehicle.**

A.   **Background**

The jury convicted Ross of violating section 26100, subdivision (c), which provides punishment for "[a]ny person who willfully and maliciously discharges a firearm *from a motor vehicle* at another person other than an occupant of a motor vehicle" (italics added), and convicted Gaines of violating section 26100, subdivision (b), which authorizes punishment for "[a]ny driver or owner of any vehicle … who knowingly permits any other person to discharge any firearm *from the vehicle*" (italics

added).  Defendants both argue that they may be convicted of violating section 26100 only if the firearm was discharged "from *within*" (italics added) the vehicle and here, Ross was outside the vehicle when he shot at the victims.  Therefore, their argument concludes, their convictions are not supported by sufficient evidence.

The People argue that the word "from" as used in section 26100 does not mean from "inside" or "within" the vehicle.  We agree and reject defendants' construction of section 26100 to require that the shooter be "inside" or "within" the motor vehicle at the time of the shooting.  As we shall explain, defendants' claim fails because their interpretation of the statute is not consistent with the definition of the word "from" in light of the statute's legislative history.

### B. Applicable Law and Standard of Review

We exercise de novo review in addressing this issue of statutory interpretation. (*People v. Brewer* (2011) 192 Cal.App.4th 457, 461.)  "Statutory construction begins with the plain, commonsense meaning of the words in the statute, ' "because it is generally the most reliable indicator of legislative intent and purpose." ' [Citation.] 'When the language of a statute is clear, we need go no further.' " (*People v. Manzo* (2012) 53 Cal.4th 880, 885 (*Manzo*) [interpreting the word "at" in § 246, which penalizes shooting at a motor vehicle; the defendant was standing outside the vehicle, but the gun was inside an open window].)

Where the meaning is ambiguous, " '[i]t is appropriate to consider evidence of the intent of the enacting body in addition to the words of the measure, and to examine the history and background of the provision, in an attempt to ascertain the most reasonable interpretation.' [Citation.]  We may also consider extrinsic aids such as the ostensible objects to be achieved, the evils to be remedied, and public policy.  [Citation.]  When construing a statute, 'our goal is " 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' " ' " (*Manzo*, *supra*, 53 Cal.4th at p. 886, first bracketed insertion in original.)

11.

The rule of lenity requires a court to prefer the interpretation that is more favorable to the defendant only if there is an egregious ambiguity and uncertainty and the court can do no more than guess what the legislative body intended. (*Manzo*, *supra*, 53 Cal.4th at p. 889.)

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*) ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].) We must accept logical inferences that the trier of fact might have drawn from the evidence although we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, at p. 1181.)

### C.    Analysis

The evidence, viewed in the light most favorable to the verdict, established that Gaines drove his vehicle into the opposite lane, close to where the victims were walking on the sidewalk, and stopped so that Ross could get out. T.J. testified that Ross got out of the vehicle, without closing the vehicle's door, and started shooting at the victims from behind the passenger side of the vehicle. Barksdale's testimony was consistent with T.J.'s testimony in that he recalled Ross was shooting while standing near the vehicle and

12.

then got into the passenger side of the vehicle.[7]  Ross then re-entered the vehicle and defendants drove away.  Ten casings were found in the middle of the street, consistent with Ross having shot from outside the passenger side of the vehicle while parked in the wrong lane near the sidewalk where the victims had been standing.  While R.D. testified that Ross may have advanced toward him during shooting, the evidence supported the inference that he fired over the vehicle just after exiting it.

### 1.  The use of "from" in section 26100 is ambiguous.

As noted, section 26100, subdivisions (b) and (c) criminalize conduct when a person discharges a firearm, or permits a person to discharge a firearm, "from" a motor vehicle.  Citing CALCRIM No. 969, Gaines also argues that one element of section 26100, subdivision (b) is "a person *within* a motor vehicle other than the owner or driver discharged a firearm" (italics added).  However, contrary to Gaines's argument, CALCRIM No. 969 does not use the phrase "within a motor vehicle," but rather, uses the words "from the vehicle."  An earlier version of jury instructions for section 26100 did describe this element as "a person *within* a vehicle [unlawfully] discharged a firearm." (CALJIC No. 9.05, italics added [used for violations of § 26100, subd. (c)]; see CALJIC No. 9.04 ["person *within a motor vehicle* other than the owner or driver, discharged a firearm" (italics added) used for violations of § 26100, subd. (b)].)  Nonetheless, "the mere fact that this sentence is in [CALJIC] does not make it legally correct.  '[J]ury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent.' " (*People v. Smith* (2014) 60 Cal.4th 603, 614, first bracketed insertion added.)

Defendants also rely on dicta in *People v. Licas* (2007) 41 Cal.4th 362, in which our Supreme Court granted review on the issue of whether assault with a firearm (§ 245,

---

[7]  The jury could have inferred that Ross was standing behind the vehicle as he fired toward the apartment complex because Barksdale testified that he had an unobstructed view of the shooter.

subd. (a)(2)) was a lesser included offense of former section 12034 (the predecessor to § 26100). (*Licas*, at pp. 364–365). "The dicta of the Supreme Court, 'while not controlling authority, carries persuasive weight and should be followed where it demonstrates a thorough analysis of the issue or reflects compelling logic.' " (*Mireskandari v. Edwards Wildman Palmer LLP* (2022) 77 Cal.App.5th 247, 263, fn. 3.) In *Licas*, however, the Supreme Court conducted no analysis of the Legislature's intended meaning of the word "from."

Our Supreme Court agreed with the Court of Appeal that the language of former section 12034, subdivision (c) did not impose a present ability requirement and, in so doing, quoted the court's observation that the statute defining the crime of shooting from a vehicle required only that " 'the perpetrator shoot *from inside a vehicle* "at" someone who is not inside a vehicle,' " nor did the dictionary definition of the word "at." (*People v. Licas*, *supra*, 41 Cal.4th at p. 369.) Therefore, our Supreme Court's use of the Court of Appeal's language only extended to the conclusion that the elements of shooting from a vehicle did not require the perpetrator to have a present ability to inflict violence. The Supreme Court did not address the meaning of "from" as used in former section 12034 in *Licas*. While the Supreme Court may have described the crime in the language used by the Court of Appeal and CALJIC No. 9.05, its analysis addressed only whether the language included the present ability element and, therefore, is not authority for the meaning of "from" as used in former section 12034. " ' " '[C]ases are not authority for propositions not considered.' " ' " (*In re Cabrera* (2023) 14 Cal.5th 476, 490.) Therefore, *Licas* provides no support for defendant's argument.

Ross similarly relies upon cases discussing section 190.2, subdivision (a)(21),[8] which defines a special circumstance for murder as "perpetrated by means of discharging

---

[8] Section 190.2, subdivision (21) was added in 1995 (Stats. 1995, ch. 478, § 2, p. 3566), eight years after former section 12034 was last substantively amended in 1987 (see part I.C.2.c., *post*), and the parties have not discussed either its legislative history or whether, or in what

14.

a firearm from a motor vehicle … with the intent to inflict death." In *People v. Rodriguez* (1998) 66 Cal.App.4th 157, the court rejected Rodriguez's claims that section 190.2, subdivision (a)(21) was overbroad and violated due process and the federal prohibition on cruel and unusual punishment. (*Rodriguez*, at p. 162.) *Rodriguez* never addressed the meaning of "from a motor vehicle" but referred to section 190.2, subdivision (a)(21) interchangeably as "discharging a firearm from a vehicle at another person with intent to kill" and the "shooting out of a vehicle" special circumstance. (*Rodriguez*, at pp. 162, 165.) We do not agree that *Rodriguez* is authority for defendants' argument that "from a vehicle" means that the shooter must have been inside the vehicle when discharging the firearm because, again, " ' " 'cases are not authority for propositions not considered.' " ' " (*In re Cabrera*, *supra*, 14 Cal.5th at p. 490.)

Ross asserts that "[i]t takes no insight to understand that 'from' in the context of section 26100, subdivision (c), means 'from within,' and not 'outside of' or 'near' or 'next to.' " We disagree. Black's Law Dictionary (6th Ed. 1990) at page 668 defines the word "from" as follows: "As used as a function word, implies a starting point, whether it be of time, place, or condition; and meaning having a starting point of motion, noting the point of departure, origin, withdrawal, etc., as he traveled 'from' New York to Chicago. [Citation.] One meaning of 'from' is 'out of.' " A similar definition is found in The American Heritage Dictionary of the English Language (1981) at page 529: "1. Beginning at a specified place or time: *walked from the station ….* 2. With a specified time or point as the first of two limits: *from age four to age eight*. 3. With a person, place, or thing as the source, cause, or instrument: *a note from the teacher*. 4. Out of: *take a book from the shelf.…* 7. Measured by reference to: *far away from home*." Webster's Third New International Dictionary (1981) at page 913 provides: "**1** — used as a function word to indicate a starting point: as (l) a point or place where an

---

manner, section 190.2, subdivision (21)'s legislative history should inform our interpretation of former section 12034.

actual physical movement (as of departure, withdrawal, or dropping) has its beginning <he set out ~ town this morning> …; (2) something that is taken as a starting point in measuring or reckoning or in a statement of limits …; (3) the starting or focal point of any activity or movement <will fight you ~ our beaches and ~ our ruined homes> <looked at me ~ under her glasses>  <~ one point of view you are right>  <I speak ~ the heart>  <shot straight ~ the hip>  …  **2** — used as a function word to indicate (1) the fact or condition of spatial or physical absence, separation, remoteness, or disjunction <an ocean separates America ~ Europe>  …  **3** — used as a function word to indicate the source or original or moving force of something:  as (1) the source, cause, means, or ultimate agent of an action or condition <all his misfortunes spring ~ that piece of folly> … (4)  the place of origin, source, or derivation of a material or immaterial thing … <assigned two chapters ~ the text>  <took a dime ~ his pocket>.…"

Section 26100 describes the discharge of a firearm "from" a motor vehicle.  Under the definitions set forth above, the statute could be criminalizing discharging a firearm "out of" of the vehicle or discharging a firearm from "inside," "on," or "near" the vehicle. Because the word "from" as used in section 26100 is susceptible to these two different meanings, we must consider evidence of the intent of the enacting body in addition to the words of the measure, and examine the history and background of the provision, to ascertain the most reasonable interpretation.[9]  (See *Manzo*, *supra*, 53 Cal.4th at p. 889.) Both defendants and the People argue that the statute is unambiguous and supports their

---

**9**      In *Manzo*, the parties agreed that the relevant definition of "at" in the statute was " '[o]f motion directed *toward*s:  In the direction of, towards, so as to get *at*; often with hostile intent, "against"; in *to run, rush, go, have, throw, shoot, let drive, aim, etc.* at.' " (*Manzo*, *supra*, 53 Cal.4th at p. 885.)  However, the definition did not resolve whether "at" should be measured by the relationship between the shooter and the vehicle (as the People contended) or by the relationship between the firearm and the vehicle (as the defendant contended).  (*Ibid.*)  "In common parlance, it can be reasonable to say that a person who is standing outside a vehicle and fires a weapon has shot at, in the direction of, or towards the vehicle, even if the tip of the weapon has crossed the threshold of the vehicle."  But the court found that the plain meaning of the statutory text did not exclude the construction proposed by the defendant and both interpretations seemed reasonable.  (*Id*. at pp. 885–886.)

proposed interpretations and, therefore, have not addressed the legislative history of section 26100. Our review of the pertinent legislative history, which we address below, does not discuss what the Legislature intended specifically with reference to use of the word "from." However, in considering "extrinsic aids such as the ostensible objects to be achieved, the evils to be remedied, and public policy," we believe that the construction that best effectuates the purpose of the law is to construe the word "from" as setting the vehicle as a starting point for firing without being limited to the interior of the vehicle. (*Manzo*, at p. 886.)

### 2. Legislative history of section 26100.

#### a) 1977 Enactment

Section 26100 is a reenactment of former section 12034. Former section 12034 was first enacted by Senate Bill No. 811 (1977–1978 Reg. Sess.) in 1977 and provided: "It is a misdemeanor for a driver of any motor vehicle or the owner of any motor vehicle, irrespective of whether such owner is occupying such vehicle, knowingly to permit any other person to carry into or bring into the vehicle a firearm in violation of section 12031 or in violation of Section 2006[10] of the Fish and Game Code or knowingly to permit such other person to discharge any firearm from such vehicle in violation of any provision of this code." (Stats. 1977, ch. 528, § 1, p. 1732.)

Senate Bill No. 811 was intended to "discourage shooting from and between vehicles." (Sen. Democratic Caucus, analysis of Sen. Bill No. 811 (1977–1978 Reg.

---

**10**    "At that time, former section 12031 provided, with certain exceptions, that 'every person who carries a loaded firearm on his person or in a vehicle … is guilty of a misdemeanor.' (Stats. 1976, ch. 1426, § 3, pp. 6376, 6377.) Former section 12031 had always contained this provision. (Stats. 1967, ch. 960, § 1, p. 2459.)" (*People v. Gonzales* (2015) 232 Cal.App.4th 1449, 1456, fn. 5 [analyzing legislative history to determine that the term "knowingly" required that the driver or owner know that the firearm was loaded]; see *id*. at p. 1456 [disagreeing with *In re Ramon A*. (1995) 40 Cal.App.4th 935].) Section 25850 is derived from former section 12031. (Compare former § 12031 with § 25850.) Fish and Game Code section 2006 makes it unlawful to possess a loaded shotgun or rifle in a vehicle or conveyance on a way open to the public or a public highway.

17.

Sess.) as amended June 15, 1977.) As originally introduced, it would have applied only to the owner of the vehicle and only if the owner "permit[ted] any person to use, operate, or occupy such motor vehicle with the owner's actual knowledge that such person will unlawfully possess a firearm in such motor vehicle in violation of Section 12031 … or that such person will discharge any firearm from such vehicle in violation of any provision of this code."[11] (Sen. Bill No. 811 (1977–1978 Reg. Sess.) as introduced Apr. 1, 1977.) The Legislative Counsel's digest described that existing law prohibited carrying loaded firearms in vehicles in public places and also prohibited shooting a firearm from or upon a public highway (a reference to § 374c) and that the proposed bill would make it a misdemeanor for the owner to permit his vehicle to be used by someone who intended to possess a loaded firearm in the vehicle or unlawfully discharge the firearm from the vehicle. (Legis. Counsel's Dig., Sen. Bill No. 811 (1977–1978 Reg. Sess.).)

On May 12, 1977, Senate Bill No. 811 (1977–1978 Reg. Sess.) was amended to proscribe both an owner and a driver from knowingly either permitting any person to carry or bring a firearm into the vehicle or permitting such other person to unlawfully discharge any firearm. This amendment also extended the prohibition to instances where the owner or driver carried the firearm into the vehicle themselves and revised the wording of the prohibition to the "knowingly to permit" language that was ultimately enacted. (Sen. Bill No. 811 (1977–1978 Reg. Sess.) as amended May 12, 1977.)[12] The Legislative Counsel's digest deleted reference to the existing misdemeanor which

---

[11] Section 374c, enacted in 1933, makes it a misdemeanor to shoot any firearm from or upon a public road or highway. (Stats. 1933, ch. 203, § 1, p. 671.)

[12] The May 12, 1977 amendment also added language to prohibit the owner from carrying or bringing a firearm into the vehicle, but this language was removed when Senate Bill No. 811 was again amended on May 25, 1977. (Sen. Bill No. 811 (1977–1978 Reg. Sess.) as amended May 25, 1977.) There were no further substantive proposed amendments to Senate Bill No. 811.

prohibited shooting a firearm on a public highway. (Legis. Counsel's Dig., Sen. Conc. Amends. to Sen. Bill No. 811 (1977–1978 Reg. Sess.).)

### b) 1986 Amendment

Former section 12034 was later amended in 1986 by Assembly Bill No. 4006 (1985–1986 Reg. Sess.). The amendment made minor changes to former section 12034, subdivision (a) and added subdivision (b), which provided: "Except as provided in Section 3002 of the Fish and Game Code,[13] any person who willfully and maliciously discharges a firearm from a motor vehicle is guilty of a public offense punishable by imprisonment in the county jail for not more than one year or in the state prison." (Stats. 1986, ch. 1430, § 3, p. 5172.)

As originally introduced, Assembly Bill No. 4006 proposed to amend (1) section 246 (shooting at an inhabited dwelling, etc.) and section 374c (shooting on a public road or highway) to increase penalties and provide for punishment as a felony or a misdemeanor, and (2) former section 12034 to provide that if great bodily injury results from an owner or driver permitting any person to discharge a firearm from a vehicle, that vehicle would be surrendered for sale at public auction. (Assem. Bill No. 4006 (1985–1986 Reg. Sess.) as introduced Feb. 21, 1986.) When next amended, all reference to former section 12034 was removed from the bill. (Assem. Bill No. 4006 (1985–1986 Reg. Sess.) as amended Apr. 17, 1986.) However, further changes removed the proposal to amend section 374c and added a proposal to amend former section 12034 with new subdivision (b) that would make it a public offense to "willfully and maliciously discharge a firearm from a motor vehicle."[14] (Assem. Bill No. 4006 (1985–1986 Reg.

---

**13** Section 3002 of the Fish and Game Code makes it unlawful to shoot at any game bird or mammal, including a marine mammal as defined in Fish and Game Code section 4500, from a powerboat, sailboat, motor vehicle, or airplane.

**14** The bill proposed to amend former section 12034, subdivision (a) by changing the language "irrespective of whether such owner is occupying such vehicle" to "whether or not the owner of the vehicle is occupying the vehicle." (Assem. Bill No. 4006 (1985–1986 Reg. Sess.) as amended Jul. 9, 1986, italics omitted.)

Sess.) as amended Jul. 9, 1986, italics omitted.)  The Legislative Counsel's Digest accompanying the amendments did not discuss the intent of the changes.  (Legis. Counsel's Dig., Assem. Conc. Amends. to Assem. Bill No. 4006 (1985–1986 Reg. Sess.).)

### c)  1987 Amendment

The last substantive amendment to former section 12034 occurred in 1987.[15] (Stats. 1987, ch. 1147, § 3; Assembly Bill No. 766 (1987–1988 Reg. Sess.).)  As originally introduced, Assembly Bill No. 766 proposed adding section 245.4 to provide for forfeiture of any vehicle if the owner used it to violate section 245, or permitted it to be used by someone else to violate section 245, and defined such use as where a firearm has been discharged by an occupant of the vehicle.  (Assem. Bill No. 766 (1987–1988 Reg. Sess.) as introduced on Feb. 19, 1987.)  The bill was then amended to place the forfeiture provisions within section 245 and to add forfeiture provisions to former section 12034 in new subdivision (c).  (Assem. Bill No. 766 (1987–1988 Reg. Sess.) as amended on Mar. 26, 1987.)

The Assembly Committee on Public Safety described the purpose of the bill as follows:  "Drive-by gang related shootings continue to pose a problem in some urban cities with large gang populations.  Because this bill would authorize the forfeiture of automobiles used in those shootings, it is intended that gang members who prize their automobiles will think twice about their use in such crimes."  (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 766 (1987–1988 Reg. Sess.) as amended Mar. 26, 1987.)

Further amendments to the bill moved the forfeiture provisions to an added section 246.1, defining use of the vehicle for forfeiture purposes as a firearm having been discharged from the vehicle at another person or by an occupant of a vehicle at the

---

[15]    Effective January 1, 2012, former section 12034 was recodified without substantive change as section 26100.  (Stats. 2010, ch. 711, § 4 [repealed]; Stats. 2010, ch. 711, § 6 [reenacted].)

20.

occupant of another vehicle, and added former section 12022.55 to provide for a five-year prison enhancement for inflicting great bodily injury or death as the result of discharging a firearm from a motor vehicle.  (Assem. Bill No. 766 (1987–1988 Reg. Sess.) as amended on Aug. 31, 1987.)  As to former section 12034, amendments to the bill proposed (1) deleting subdivision (b); (2) splitting the crimes in subdivision (a) so that subdivision (a) retained the misdemeanor crime of an owner or driver permitting another person to bring or carry a firearm into the vehicle and moved the crime of an owner or driver permitting another person to discharge a firearm from the vehicle to subdivision (b) and provided for punishment as either a misdemeanor or felony;[16] and (3) adding subdivision (c) to punish as a felony any person who willfully and maliciously discharges any firearm from a motor vehicle at another person (other than an occupant of the vehicle).[17]  (Assem. Bill No. 766 (1987–1988 Reg. Sess.) § 2, as amended on Aug. 31, 1987.)

The final amendment to the bill retained former section 12034, subdivision (b), which punished the willful and malicious discharge of a firearm from a vehicle as a misdemeanor and moved it to added subdivision (d).  (Assem. Bill No. 766 (1987–1988 Reg. Sess.) § 3, as amended on Sept. 10, 1987.)  The act was characterized as "an urgency statute necessary for the immediate preservation of the public peace, health, or safety" that was "essential" to take effect immediately "[i]n order to make the shooting of motorists on this state's public streets and highways a serious felony offense, and in order to deter persons from violent actions upon our public streets and highways."  (Assem.

---

[16]    As a misdemeanor, violation of section 12034, subdivision (b) would be punished by up to one year in county jail or, as a felony, in state prison for 16 months, two years, or three years. (Assem. Bill No. 766 (1987–1988 Reg. Sess.) § 3, as amended on Aug. 31, 1987.)

[17]    Violation of section 12034, subdivision (c) would be punished by imprisonment in state prison for three, five, or seven years.  (Assem. Bill No. 766 (1987–1988 Reg. Sess.) § 2, as amended on Aug. 31, 1987.)

Bill No. 766 (1987–1988 Reg. Sess.) § 5, as amended on Sept. 10, 1987; Stats. 1987, ch. 1147, § 5, p. 4060.)

One enrolled bill report[18] recognized that the original bill dealt with vehicle forfeiture for crimes involving assaults with firearms and "[l]ate amendments to the bill provide for vehicle forfeiture, as well as other sanctions, as a result of on-highway acts of violence." (Cal. Highway Patrol, Enrolled Bill Rep. on Assem. Bill No. 766 (1987–1988 Reg. Sess.) Sept. 18, 1987, p. 2.) "[W]e feel that the provisions of this bill will serve as effective deterrents to future acts of violence on the roadways." (*Ibid*.)

### 3. Section 26100 applies to defendants' conduct.

As discussed above, former section 12034 was originally intended to "discourage shooting from and between vehicles." (Sen. Democratic Caucus, analysis of Sen. Bill No. 811, *supra*, as amended June 15, 1977.) Amendments to former section 12034 were made in 1987 to "deter persons from violent actions upon our public streets and highways." (Stats. 1987, ch. 1147, § 5, p. 4060.) Assembly Bill No. 766 initially addressed forfeiture of vehicles to deter drive-by gang shootings which "continue[d] to pose a problem in some urban cities with large gang populations." (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 766, *supra*, as amended Mar. 26, 1987.) As finally amended, Assembly Bill No. 766 increased penalties where an owner or driver permitted another individual to discharge a firearm from a vehicle and for the individual discharging the firearm willfully, maliciously, and at another person not occupying the

---

[18]    "An enrolled bill report is properly considered as part of the bill's legislative history because it is 'likely to reflect the understanding of the Legislature that enacted the statute … particularly because it is written by a governmental department charged with informing the Governor about the bill so that he can decide whether to sign it, thereby completing the legislative process. Although these reports certainly do not take precedence over more direct windows into legislative intent such as committee analyses, and cannot be used to alter the substance of legislation, they may be as here "instructive" in filling out the picture of the Legislature's purpose.' " (*People v. Gonzales*, *supra*, 232 Cal.App.4th at p. 1460, fn. 7.)

vehicle.  (Assem. Bill No. 766 (1987–1988 Reg. Sess.) § 5, as amended on Sept. 10, 1987; Stats. 1987, ch. 1147, § 5.)

The legislative history's expressly stated concerns are the danger associated with discharging a firearm from a vehicle and the need to deter persons from violent actions upon public streets and highways, and these concerns are in no way diminished if the shooter discharges a firearm from a vehicle, stopped in the middle of the street, that he has just exited and is using as cover.  (See *Manzo*, *supra*, 53 Cal.4th at pp. 886–887 ["The legislative history's expressly stated concern about the danger associated with shooting 'into' a home or an occupied vehicle is in no way diminished if the shooter is so close that the gun breaches the plane of the home or vehicle."].)  In such circumstances, the shooter is discharging his firearm "from" the vehicle and the vehicle is the starting point of the movement.  (Webster's 3d New Internat. Dict., *supra*, p. 913, col. 3 ["**1** — used as a function word to indicate a starting point:  as (l) a point or place where an actual physical movement (as of departure, withdrawal, or dropping) has its beginning"].)

Moreover, defendants' interpretation of requiring the shooter to be inside the vehicle when discharging the firearm could cause guilt to turn on whether the shooter opened his window to fire or stepped out of the vehicle's door and discharged his firearm over the vehicle.  (See *Manzo*, *supra*, 53 Cal.4th at p. 887 [characterizing Manzo's argument that he could not be convicted of shooting at a motor vehicle because the tip of the firearm crossed the threshold of the vehicle as causing "guilt to turn on such trivialities as the length of the barrel or the degree to which the shooter's arm was extended"].)  As in *Manzo*, "[w]e find no indication that the Legislature intended the scope of section [26100] to depend on such inconsequential matters, nor do[ ] defendant[s] explain why the Legislature would have wanted to distinguish among these scenarios."  (*Ibid*.)

Defendants construe the word "from" as used in the statute to require that the firearm and/or the shooter must be "inside" or "within" a motor vehicle at the time of the

shooting. The plain text of the statute, however, does not impose such a requirement, and it would be improper for us to add one. Common understanding of "from" is consistent with a shooter who is either outside or inside the vehicle when firing. Furthermore, defendants' definition would render the term "from" inapplicable to certain types of motor vehicles, such as motorcycles, which users ride upon and do not have an "inside." Similarly, it would not account for a shooter standing in the bed of a pickup truck, or sitting on the hood of vehicle, or hanging out of a vehicle window. Moreover, adopting defendants' construction of the statute would contravene the legislative intent of the statute—the deterrence of drive-by shootings and the need to deter persons from violent actions upon public streets and highways.

Although it might be argued that shooting from an immobile vehicle in the street is not within the meaning of "drive-by shooting," such conduct does undeniably qualify as a violent action upon the street. In interpreting former section 12022.55 (discharging a firearm from a motor vehicle that results in death or great bodily injury), *People v. Bostick* (1996) 46 Cal.App.4th 287 rejected Bostick's argument that the jury should have been instructed that the shooting occurred from a vehicle that was " 'involved in an actual drive-by on a public street or highway.' " (*Id*. at p. 291.) Finding that the term " 'drive-by' " did not appear anywhere in former section 12022.55, the court rejected Bostick's argument that the vehicle must be in motion for the enhancement to apply. (*Bostick*, at p. 291.) "The argument would fail even if we independently construed the Legislature's intent. We have no doubt that the gang-type drive-by shooting was one of the primary concerns in enacting [former] section 12022.55[,] [citation], but there are other plausible purposes for the enhancement. The urgency clause … refers not only to the shooting of motorists, but 'deter[ring] persons from *violent actions upon our public streets and highways ….*' [Citation.] Street safety is therefore another independent legislative goal of the statute." (*Id*. at p. 292, fourth bracketed insertion in original.)

24.

We agree that "firing a gun from a motor vehicle is an especially treacherous and cowardly crime. It allows the perpetrator to take the victim by surprise and make a quick escape to avoid apprehension, as illustrated by the facts here." (*People v. Bostick*, *supra*, 46 Cal.App.4th at p. 292.) The Legislature could rationally have determined that the foregoing considerations justify imposing an increased sentence on the perpetrator. While recognizing that " 'drive-by' shootings certainly grab the headlines," *Bostick* concluded, "the use of a motor vehicle as a staging ground for shootings which cause death or great bodily injury, whether the vehicle happens to be in motion or stationary, on a public street or private property, is a greater evil which the Legislature could and did attempt to deter through the clear language of the statute." (*Ibid*.)

The rule of lenity would require that we adopt defendants' reading of the statute if " ' "two reasonable interpretations of the same provision stand in relative equipoise." ' " (*Manzo*, *supra*, 53 Cal.4th at p. 889.) However, we do not believe that degree of uncertainty is found in this case. The legislative history, the purpose of the statute, general public policy concerns, and logic all favor an interpretation that would recognize a violation of section 26100 when a driver stops his vehicle in the middle of the street, the shooter opens the vehicle's door and, while standing at the open door and behind the vehicle, commences shooting at victims who are standing on the sidewalk. An interpretation exculpating a defendant in those circumstances, even if a reasonable reading of the statutory text, is not, for the reasons given above, equally as reasonable as the one proffered by the People. The rule of lenity does not mean " ' "that the act be given the 'narrowest meaning.' It is sufficient if the words are given their fair meaning in accord with the evident intent of [the legislative body]." ' " (*Manzo*, at p. 890; see *id*. at p. 889 [rejecting application of the rule of lenity and finding "[t]he legislative history, the purpose of the statute, general public policy concerns, and logic all favor an interpretation that would recognize a violation of section 246 when the shooter stands outside and fires at an occupied motor vehicle, regardless of whether the shooter is standing so close that

25.

the gun breaks the plane of the vehicle," and finding an interpretation exculpating a defendant in those circumstances may be a reasonable reading of the statutory text but not equally as reasonable as the one proffered by the People].)

Defendants have not cited any case law, legislative history, or public policy that persuades us that we should adopt their position. Sufficient evidence supports the jury's verdict that Ross discharged a firearm from the motor vehicle and Gaines permitted him to do so.

## II. Gaines was properly convicted of both the underlying crimes and as an accessory to such crimes based upon his conduct in assisting Ross escape after the underlying crimes had ended.

### A. Background

Gaines was convicted of attempted murder and assault as a principal in counts 1 through 5 and as an accessory after-the-fact to the same crimes in count 10. In closing argument, the prosecutor told the jury that count 10 was premised upon Gaines's act in driving Ross from the crime: "Ross would have maybe just had to run away on foot and not had the advantage of being able to get back in[to] the [vehicle] and slip away." "[Gaines] intended that Ross not get caught for the shooting. [Gaines] let [Ross] get back [into] the [vehicle] and they sped off …."

Gaines's attempted murder and assault convictions were based on his initial acts of driving Ross to the shooting, positioning the vehicle so that Ross had close access to the victims, and waiting for Ross as he shot the victims. Gaines's accessory conviction is based upon his actions after the completion of the crimes of assault and attempted murder—when he allowed Ross back into the vehicle and then drove both himself and Ross away from the scene. Gaines argues that the conduct supporting his crimes of aiding and abetting attempted murder and assault and the crime of accessory after the fact were based on the same conduct and he cannot be convicted of both crimes. We disagree.

26.

## B.    Applicable Law and Analysis

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561; see § 31.)  "By contrast, section 32 provides that '[e]very person who, *after* a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, … having knowledge that said principal has committed such felony … , is an accessory to such felony.' " (*In re Malcolm M.* (2007) 147 Cal.App.4th 157, 165 (*Malcolm M.*).)  "[T]o convict a person under this section, there must be proof that a principal committed a particular felony, the accused knew the principal committed a felony, the accused did something to help the principal get away with the crime, and the accused acted with the intent to help the principal get away with the crime." (*Ibid.*)

Our decision in *Malcolm M.* reviewed the case law regarding this issue and noted that California cases were divided over whether to adopt the rule that a person cannot be convicted or sentenced as both a principal and an accessory to the same felony. (*Malcolm M.*, *supra*, 147 Cal.App.4th at pp. 165–169.)  In summary, "Several cases have expressed approval of the rule, though on varying grounds and largely in dicta.  (*People v. Prado* (1977) 67 Cal.App.3d 267, 271–274; *People v. Francis* (1982) 129 Cal.App.3d 241; *People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1256.)  Of those cases, only in *Francis* did the Court of Appeal actually vacate an accessory conviction on the grounds that, as a matter of law, the defendant could not be convicted as both a principal and an accessory to the same crime.  (*People v. Francis*, *supra*, 129 Cal.App.3d at pp. 251–253.)[19]  Two other cases, however, have expressed disapproval of that rule, although

---

**19**    *Francis* agreed with *Prado*'s conclusion that one could not be convicted as both a principal and accessory to the same completed offense based upon an analogy to the prohibition of multiple convictions as both a thief and receiver of the same stolen property. (*People v.*

27.

again largely in dicta. (*People v. Riley*[ (1993)] 20 Cal.App.4th [1808,] 1813–1817; *People v. Mouton*[ (1993)] 15 Cal.App.4th [1313,] 1321–1325[, disapproved on other grounds in *People v. Prettyman* (1996) 14 Cal.4th 248, 278].) Only in *Riley* did the Court of Appeal actually affirm separate convictions (and imposition of separate concurrent sentences) as both a principal and an accessory to the same crime. (*People v. Riley*, *supra*, 20 Cal.App.4th at pp. 1813–1817.)" (*In re Eduardo M.* (2006) 140 Cal.App.4th 1351, 1359 (*Eduardo M.*).)

*People v. Prado*, *supra*, 67 Cal.App.3d (*Prado*) was the first California case to raise this issue. (*Id.* at p. 273.) Gonzalez, Prado's codefendant, was convicted of both armed robbery and accessory for having assisted Prado to escape arrest, and the jury was instructed that Gonzalez could be convicted of both charges. (*Id.* at p. 270.) The opinion does not describe further the conduct which formed the basis of the robbery charge, nor the details of the assistance for the escape.[20] *Prado* recognized that "[t]he accessory after the fact, … commits an offense separate and distinct from the crime of the principal" and that "[t]his is a difference 'sometimes overlooked.' " (*Prado*, at p. 271.) But then *Prado* recited several treatises describing the rule at common law: "The accessory after the fact must be charged with and prosecuted for an offense not included in the criminal act of the principal"; " 'the accessory himself must not be guilty of that felony as a principle"; and

---

*Francis*, *supra*, 129 Cal.App.3d at p. 248.) The People agreed that the rule should apply. (*Id.* at p. 246.) For reasons we shall explain later, we do not believe that such an analogy is applicable in this context.

[20] If Gonzalez assisted Prado by driving him and the stolen property from the robbery, then Gonzalez aided and abetted the robbery because he assisted while the crime was still in progress (i.e., during the asportation phase of the robbery). (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164 (*Cooper*) ["For purposes of determining aider and abettor liability, the commission of a robbery continues until all the acts constituting the offense have *ceased*."].) "[I]t is essential to distinguish the act and intent that constitute 'aiding and abetting' the commission of a crime, from conduct that will incur the lesser liability of an 'accessory' to the crime—defined as conduct by one who, '*after a felony has been committed*, ... aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony.' " (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039 (*Montoya*).)

28.

the accessory after the fact " 'must be indicted as such, and cannot be treated as a principal.' "[21] (*Prado*, at pp. 271–272). As to the first and last quotations, they appear to be no more than a reflection of the rule that assistance provided to a principle after the completion of the crime renders a defendant liable for accessory and not as a principal under the doctrine of aiding and abetting. (See *Cooper*, *supra*, 53 Cal.3d at pp. 1168–1169 [a getaway driver who forms the intent to aid a robber to escape after asportation has ceased cannot facilitate the commission of the robbery and is culpable as an accessory]; *Montoya*, *supra*, 7 Cal.4th at p. 1039.)

*Prado* provided no legal analysis to explain the rule that " '[t]he accessory himself must not be guilty of that felony as a principle.' " (*Prado*, *supra*, 67 Cal.App.3d at p. 271.) We agree with *People v. Mouton*, *supra*, 15 Cal.App.4th 1313 (*Mouton*) that, even if such was the rule at common law, the law related to the charge of accessory in California is in statute and differs from common law rules such that the common law "cannot be adopted unaltered by California courts." (*Id*. at p. 1323.) *Mouton* described *Prado*'s reliance on treatises summarizing common law as "questionable in light of the significant differences between the common law of accessory and principal and California law as codified in the Penal Code." (*Ibid*.) As an example, at common law, " '[a] principal in either the first or second degree may not also become an accessory after the fact by his subsequent acts,' " but, " 'one who was only an accessory before the fact may also be an accessory after the fact.' " (*Ibid*., quoting 2 LaFave & Scott, Substantive

---

[21]    One court has described this premise as a "troublesome" element of the common law crime of accessory after the fact. (*State v. Hawkins* (1992) 326 Md. 270, 294; see *id*. at pp. 283, 285 [providing the history of Maryland's adoption of English common law and describing Maryland as one of the few states that has retained the common law doctrine of accessory after the fact in virtually the same form it existed in the eighteenth century].) However, *Hawkins* then declared, "as a matter of public policy, that, henceforth, in the interest of justice, it is no longer an element of the crime of accessory after the fact that the accessory may not be a principal in either degree, in the commission of the substantive felony." (*Id*. at p. 294.) Going forward, a defendant may be convicted of both crimes, but judgment may only be entered on the greater crime. (*Id*. at p. 295.)

Criminal Law (1986) § 6.9, p. 169, fns. omitted.) *Mouton* concluded, "In California, however, the distinction between accessories before the fact and principals has been abrogated; those who under common law would have been accessories before the fact are simply prosecuted as principals in the crime. (§§ 31, 971.) The common law rule described by LaFave and Scott, therefore, cannot be adopted unaltered by California courts; translated into the terms of the Penal Code, the rule would suggest that some, but not all, principals may also be convicted as accessories." (*Mouton*, at p. 1323; see *People v. Nuckles* (2013) 56 Cal.4th 601, 607 ["[s]ection 971 abolished the common law distinction between accessories before the fact and principals and states that 'all persons concerned in the commission of a crime … shall hereafter be prosecuted, tried and punished as principals' "]; *Montoya*, *supra*, 7 Cal.4th at p. 1039, fn. 7 [" '[I]n accord[ ] with the clear trend, the accessory after the fact is no longer treated as a party to the underlying felony, as at common law. This kind of accessory is coming to be recognized for what he is: an "obstructer" ' of justice, the author of a separate and independent offense.' "]; *People v. Mitten* (1974) 37 Cal.App.3d 879, 883 [error to consider the accessory as responsible in some manner for the initial felony in light of California's abrogation of common law distinction between "accessory before the fact" and "accessory after the fact"].)[22]

We additionally note that section 954 provides that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts." (§ 954.) "The prosecution is not required to elect between the different offenses or counts set forth in the accusatory

---

[22] *People v. Mitten* explained that each type of accessory was previously considered as some kind of party to the principal crime and the acts of the "accessory after the fact" (equivalent to those of California's accessory as defined in § 32) and the principal offense were considered as one continuous criminal transaction. (*People v. Mitten*, *supra*, 37 Cal.App.3d at p. 883.) "And, as we have stated, one who would formerly have been an 'accessory after the fact' is now guilty as an accessory, a crime that is separate and distinct from the principal offense." (*Ibid*.)

pleading, but the defendant may be convicted of any number of the offenses charged."[23] (§ 954.)

Prado also relied, by analogy, on cases holding a thief cannot be convicted of both the theft and receiving the stolen property. (*Prado*, *supra*, 67 Cal.App.3d at p. 271, citing *People v. Jaramillo* (1976) 16 Cal.3d 752, 758, superseded by statute as stated in *People v. Strong* (1994) 30 Cal.App.4th 366, 373.) Jaramillo was convicted of unlawfully driving or taking a vehicle (Veh. Code, § 10851) and receiving stolen property (§ 496, subd. (1)) (*Jaramillo*, at p. 754), and "it [is] a fundamental principle that one may not be convicted of stealing and of receiving the same property" (*id*. at p. 757). However, that specific rule is based upon the statutory intent of the Legislature in enacting section 496 that receiving stolen property is not a crime intended to apply to the individual who stole the property.[24] (*Jaramillo*, at p. 758.) Neither *Prado*, nor any case applying *Prado*, has identified any similar legislative intent that section 32 should not apply to a defendant who also participates in the underlying crime with other principals. (See *Prado*, *supra*, 67 Cal.App.3d at p. 271.) In *People v. Allen* (1999) 21 Cal.4th 846, our Supreme Court refused to apply this rule to prevent dual convictions for burglary and receiving stolen property obtained during burglary because (1) multiple offenses are authorized by section 954, "an important statute of general application" (*Allen*, at p. 866), and (2) it

---

[23] Our Supreme Court has limited section 954 and does not permit multiple convictions for a different statement of the same offense when it is based on the same act or course of conduct, or, put another way, " ' "if a defendant cannot be convicted of a greater and a lesser included offense based on the same act or course of conduct, dual convictions for the same offense based on alternate legal theories would necessarily be prohibited." ' " (*People v. Aguayo* (2022) 13 Cal.5th 974, 982.) Accessory is not a lesser included offense of the completed crime that a defendant assisted although it may be a lesser related crime. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1230; *People v. Majors* (1998) 18 Cal.4th 385, 408.)

[24] Recognized exceptions to this rule include "when there is evidence of complete divorcement between the theft and a subsequent receiving, such as when the thief has disposed of the property and subsequently receives it back in a transaction separate from the original theft," or if the thief conspired with the receiver. (*People v. Jaramillo*, *supra*, 16 Cal.3d at p. 759, fn. 8.)

31.

could find no evidence that the Legislature intended to broaden term "theft" to include burglary as a crime where the perpetrator cannot be convicted of receiving the stolen property (*id*. at p. 863).

*Prado* also relied upon *People v. Wallin* (1948) 32 Cal.2d 803 (*Wallin*) as "[t]he sole California authority touching upon this question … which hints at the principle of mutual exclusivity of the crime of the principal and accessory after the fact." (*Prado*, *supra*, 67 Cal.App.3d at p. 272.) However, we read *Wallin* as rejecting the premise that being a principal and being an accessory are necessarily mutually exclusive as a matter of law. In that case, Mrs. Paz had a disabled child, and she and Wallin discussed killing the little girl. After Mrs. Paz did so, Wallin helped her dispose of the body and was charged with accessory to murder. Wallin requested that the trial court instruct the jury that Mrs. Paz, a witness at Wallin's trial, was an accomplice whose testimony required corroboration. (*Wallin*, at pp. 804–805.) The Attorney General argued that Mrs. Paz could not be an accessory after the fact to her own crime; hence, she was incapable of committing the offense with which Wallin was charged. (*Id*. at p. 806.) Our Supreme Court disagreed, stating: "The murder was completed as soon as the child was killed, and no subsequent acts on the part of Mrs. Paz or any other person were required to be shown in order to establish the elements of that offense. [Wallin]'s crime of being an accessory under section 32 was separate and distinct [citation], although it, of course, depended on the previous commission of the murder. He became chargeable under section 32 when he aided Mrs. Paz to conceal her crime, and she became liable to prosecution for the identical offense by reason of section 31 when she encouraged him to assist her in avoiding arrest and punishment." (*Id*. at p. 807.)

In so holding, *Wallin* recognized that "[i]t may be that a murderer *who acts alone* in concealing her crime cannot be separately charged as an accessory, but it does not follow that she cannot become liable as such if she encourages another to aid her in avoiding arrest and punishment." (*Wallin*, *supra*, 32 Cal.2d at p. 806, italics added.) We

32.

do not interpret this statement as either adopting or recognizing the applicability of the common law rule of mutual exclusivity or inconsistency between convictions of accessory and the completed crime, but rather, a statement of the obvious proposition that one cannot help oneself to commit a crime. (See § 32 ["[e]very person who, after a felony has been committed, harbors, conceals or aids a principal in such felony"].)

*Prado* concluded, "The foregoing authorities, and right reason, compel a conclusion that" an accused cannot be convicted of the completed felony and as an accessory because "[their] state of mind—the intent required to be an accessory after the fact—excludes that intent and state of mind required to be a principal. The requisite intent to be a principal in a robbery is to permanently deprive the owner of his property. Thus, this is a totally different and distinct state of mind from that of the accused whose intent is to aid the robber to escape. These are mutually exclusive states of mind and give rise to mutually exclusive offenses." (*Prado*, *supra*, 67 Cal.App.3d at p. 273.) We disagree.

We have previously recognized that "[c]ourts generally have rejected the notion [adopted by *Prado*] that being a principal and being an accessory are necessarily mutually exclusive as a matter of law." (*Malcolm M.*, *supra*, 147 Cal.App.4th at pp. 165–166, citing *Wallin*, *supra*, 32 Cal.2d 803, *Mouton*, *supra*, 15 Cal.App.4th 1313, & *People v. Riley*, *supra*, 20 Cal.App.4th 157 (*Riley*).) After reviewing those authorities, we concluded "that those which eschew or limit *Prado* are the better reasoned, and that being a principal in a crime and being an accessory to that crime are not mutually exclusive offenses as a matter of law." (*Malcolm M.*, at p. 169.) Furthermore, our Supreme Court has recognized that "it is well established that an individual may entertain multiple criminal objectives simultaneously."[25] (*People v. Biane* (2013) 58 Cal.4th 381, 397.)

---

[25] Somewhat analogously, *Biane* was addressing that section 31, defining aiding and abetting, is not applicable where the same conduct that would constitute aiding and abetting is criminalized by a separate statute. (*People v. Biane*, *supra*, 58 Cal.4th at p. 391.) However, the court rejected the proposition that the offeror of a bribe cannot " 'as a matter of law' " aid and abet another person receiving the bribe pursuant to that premise and held that conviction of both

33.

Here, Gaines's conviction for assault and attempted murder depended upon Gaines's actions of driving Ross in search of the victims, waiting and watching for the victims, driving Ross closer to the victims, and remaining with him as he shot at the victims. These actions evidence his intent to assist Ross in shooting the victims. The conviction for accessory was based upon acts after those crimes were completed, when Gaines allowed Ross back into the vehicle and drove him away.[26] Because the crimes themselves were already complete, Gaines's driving from the scene could not have assisted in committing the crime itself, and his intent at that point could not still have been to assist in the crime, but to leave the scene to avoid capture and help Ross escape. (*Cooper*, *supra*, 53 Cal.3d at p. 1164 ["It is legally and logically impossible to both form the requisite intent and in fact aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended."].)

We conclude that Gaines was properly convicted of attempted murder, assault, and accessory because these convictions were based on factually separate acts and involved distinct criminal intents. In *Mouton*, *supra*, 15 Cal.App.4th 1313, Mouton aided and abetted a murder, later concealed the shooter's jacket and gun, and gave false statements

---

crimes is authorized if the offeror's conduct, beyond offering or paying the bribe, satisfies the elements of aiding and abetting the receipt of the bribe. (*Id*. at p. 389.) The exception to liability pursuant to section 31 applies only where "an individual might otherwise be deemed to be an active offender in the commission of one crime and an accomplice in the commission of another crime 'at the same time and *through the same overt acts*.' " (*Biane*, at p. 393.)

[26] "[A]n assault is complete once the violence that would complete the battery is commenced." (*People v. Fleming* (2018) 27 Cal.App.5th 754, 767, citing *People v. Colantuono* (1994) 7 Cal.4th 206, 216, superseded by statute on another ground as stated in *People v. Conley* (2016) 63 Cal.4th 646, 660.) While we found no case addressing the duration of an attempted murder for accessory liability, for purposes of aiding and abetting liability, our Supreme Court has considered the heightened risk to the victim when determining the duration of robbery and burglary and concluded that robbery continues through the asportation of property to a place of temporary safety (*Cooper*, *supra*, 53 Cal.3d at p. 1166) and burglary is not complete until the perpetrator finally leaves the structure (*Montoya*, *supra*, 7 Cal.4th at pp. 1050–1051). So, while a murder ends with death of a victim (*People v. Celis* (2006) 141 Cal.App.4th 466, 471), we conclude that the attempted murder in this case ended no later than when the last bullet was fired and either defendants or the victims left the scene.

34.

to the police.  (*Id*. at p. 1324.)  Although Mouton argued he could not be convicted of both, the court held:  "[T]here is no bar to conviction as both principal and accessory where the evidence shows distinct and independent actions supporting each crime." (*Ibid*.)  The court further noted, "Although [Mouton] was technically convicted of being an accessory to his own crime, in substance he was convicted for two different sets of actions."  (*Id*. at pp. 1324–1325.)  Similarly, in *Riley*, *supra*, 20 Cal.App.4th 1808, Riley was convicted of second degree murder as the driver of a truck in which a passenger shot and killed a person and of being an accessory to a murder by giving his business partner the murder weapon the next day.  (*Id*. at pp. 1810–1811, 1812.)  In affirming both convictions, the court held:  "Once the murder was completed, [Riley]'s further acts of attempting to dispose of the murder weapon were entirely separate and distinct, and served a further and different purpose.  The imposition of separate liability for these distinct and independent actions was proper."  (*Id*. at pp. 1816–1817.)

In rejecting a claim that accessory is a defense to the completed crime, our Supreme Court recognized that they were separate crimes and "[a] defendant can be convicted of both murder and being an accessory to murder if the defendant aids the principal both before and during, as well as after, the murder is committed."  (*People v. Jennings* (2010) 50 Cal.4th 616, 668, citing with approval *Riley*, *supra*, 20 Cal.App.4th at p. 1815, *Mouton*, *supra*, 15 Cal.App.4th at pp. 1324–1325, & *Wallin*, *supra*, 32 Cal.2d at pp. 806–807.)

Gaines relies upon *Eduardo M.*, *supra*, 140 Cal.App.4th 1351, which recognized the conflict in the case law but did not attempt to resolve it.  The court stated:  "[W]e hold only that a defendant who is convicted as a principal cannot also be convicted as an accessory solely on the basis of [their] immediate flight from the crime scene and [their] subsequent denials of [their] own involvement, even if that conduct incidentally helps other principals to escape."  (*Id*. at p. 1359.)  *Eduardo M.* believed that its holding was consistent with *Riley* and *Mouton* (even though they expressly disapproved of the

common law rule prohibiting conviction for both accessory and the completed crime) because convictions in those cases rested upon the fact that the defendants attempted to dispose of the murder weapons (*Eduardo M*., at p. 1360, fn. 5 [*Riley* and *Mouton* relied heavily on conduct of both defendants attempting to hide or dispose of the murder weapon]), not upon "mere flight and self-exculpatory statements" (*id.* at p. 1359, citing *Riley*, *supra*, 20 Cal.App.4th at p. 1815 & *Mouton*, *supra*, 15 Cal.App.4th at p. 1324).

*Eduardo M.* based its holding on several factors, some of which we have already rejected.[27] (*Eduardo M*., *supra*, 140 Cal.App.4th at pp. 1360–1361.) First, *Eduardo M.* relied upon case law which recognized that a principal to a felony cannot become an accessory to their own escape. (*Id.* at p. 1360.) As *Eduardo M*. recognized, none of the cases upon which it relied for this proposition actually discuss it in detail or apply to these facts, and "some appear to rely on an unexplained adoption of the common law rule that principals cannot be accessories to their own felonies." (*Ibid*.) As discussed above, we concluded that the common rule is not applicable to section 32. Nonetheless, *Eduardo M.* supported its holding by the following reasoning: "Nearly all felons, whether acting alone or in concert with others, intend before, during, and after committing the felony to escape being apprehended and punished for their crimes. Attempting to escape after committing a felony is an inherent part of committing the felony, involving in most cases acting on a previously formed intent. Thus, escaping does not create greater criminal culpability." (*Eduardo M.* at p. 1360.) "In any event, were it not so, every felon who tried to escape apprehension by fleeing from the crime scene thereby would become an accessory to his own felony, a result that would turn nearly every felony into two separate crimes and thus expand accessory liability beyond

---

[27]    In *Malcolm M*., we distinguished *Eduardo M.* because Malcolm actively attempted to conceal a firearm when stopped by police while escaping the crime. (*Malcolm M.*, *supra*, 147 Cal.App.4th at pp. 169, 171.) However, we ultimately overturned the accessory conviction because Malcolm's conduct occurred during his accomplice's ongoing (and not yet completed) crime of possession of an assault weapon firearm. (*Id.* at p. 171.) While we did not reject *Eduardo M*.'s reasoning in *Malcolm M*., we do so now.

36.

any reasonable relation to increased criminal culpability or societal harm. Similar reasoning applies to a principal's postcrime denials of his own involvement." (*Ibid.*, fn. omitted.)

We do not agree with *Eduardo* because a felon who commits a crime cannot be convicted of assisting himself unless, as in *Wallin*, the felon aids and abets another individual to assist after the crime. Such a rule would only have application to assistance a defendant provides to another accomplice to the completed crime. As for expanding culpability by additional crimes, as we discussed, section 954 reflects the Legislature's approval of charging two or more different offenses connected together in their commission, or different statements of the same offense, or two or more different offenses of the same class of crimes or offenses under separate counts and convicting the defendant of any number of the offenses charged. (See § 954.) In the absence of any evidence of legislative intent to the contrary, we cannot disregard section 954 in favor of the rule *Eduardo M.* advances.[28]

*Eduardo M.* justified its holding by reasoning that if a felon cannot be subjected to additional liability as an accessory for fleeing and denying his guilt, then the same rule should apply to a principal whose flight and denials have the incidental effect of helping a coprincipal to escape. (*Eduardo M.*, *supra*, 140 Cal.App.4th at p. 1361.) We do not agree that this reasoning justifies a disregard for section 954 or distinguishes escape after a crime from other types of conduct that assists an accomplice to escape culpability. *Eduardo M.* concludes that denials of involvement and escape "are such ubiquitous

---

[28]     The Supreme Court of Colorado also rejected a defendant's assertion that he could not be convicted both as a principal in a completed crime and as an accessory upon the defendant's failure to show that either constitutional necessity or statute required it. (*Montoya v. People* (2017) 394 P.3d 676, 690–691.) The court, consistent with our reasoning here, based its conclusion on (1) Colorado law treating accessory as a separate offense and independent to the crime committed by the defendant rendering assistance, (2) a statute providing that a defendant may be prosecuted for each offense where his conduct establishes that he committed more than one offense, and (3) accessory to a crime not being a lesser included offense of the completed offense. (*Ibid.*; see Colo. Rev. Stat. Ann. §§ 18-8-105, 18-1-408(1)(C).)

features of criminal conduct" that "they are too equivocal to constitute separate acts supporting an inference that the fleeing and guilt-denying felon harbored a separate intent to aid the escape of his coprincipals." (*Eduardo M*., at p. 1361.) However, it is a question for the jury as to whether the act of flight could support a separate intent to aid the escape of an accomplice.

We have (1) rejected defendants' case law and the common law rule against dual convictions for the crimes and as an accessory and (2) concluded that legislative intent does not bar application of section 32. Defendants have advanced no other legal principle to support any prohibition for separately convicting a defendant for the completed crime and accessory for assisting an accomplice after the crime.

Generally, "there is no bar to conviction as both principal and accessory where the evidence shows distinct and independent actions supporting each crime. When a felony has been completed and a person knowingly and intentionally harbors, conceals or aids the escape of one of the felons, that person is guilty as an accessory to a felony under section 32, whatever his or her prior participation in the predicate felony." (*Mouton*, *supra*, 15 Cal.App.4th 1313, 1324.) Once the attempted murder and assaults were completed, Gaines's further acts of allowing Ross into the vehicle and driving Ross from the scene were separate and distinct and served a further and different purpose. We conclude that Gaines's separate conduct in driving Ross from the crime scene after the crimes were completed supports the accessory charge, and conviction of that charge is not legally barred by the common law rule that a principle may not be convicted as an accessory to the same crime because (1) there was nothing inconsistent between conviction of Gaines as a principal to the attempted murder and assaults and his conviction as an accessory after the fact, (2) the elements of the offenses do not overlap, and (3) each conviction depended upon an entirely different intent and conduct. The imposition of separate liability for these distinct and independent actions was proper.

We affirm the convictions.

38.

**III.    Ross's conviction for attempted murder is supported by sufficient evidence of intent to kill.**

    **A.    Applicable Law and Standard of Review**

Ross contends, in substance, that the evidence is insufficient under the due process clause of the Fourteenth Amendment to the federal Constitution to support his conviction for first degree attempted murder.  " 'In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.]  We apply an identical standard under the California Constitution." (*Young*, *supra*, 34 Cal.4th at p. 1175.)  We have set forth this standard of review in detail *ante*, in part I.B., and we do not repeat it here.

Ross was convicted on counts 1 of attempted murder.  " 'The mental state required for attempted murder has long differed from that required for murder itself.  Murder does not require the intent to kill.  Implied malice—a conscious disregard for life—suffices. [Citation.]'  [Citation.]  In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]  Hence, … for [a] defendant to be convicted of the attempted murder …, the prosecution had to prove he acted with specific intent to kill that victim." (*People v. Smith* (2005) 37 Cal.4th 733, 739, third bracketed insertion in original.)  Intent to kill can be established by showing that the assailant either desired the result, i.e., death, or knew to a substantial certainty that the result would occur. (*Ibid*.)

Here, Ross contends the evidence is insufficient to establish his intent to kill because no "credible" witness testified that R.D., or any victim, was "down range" from the shooter, the bullet strikes were found above the height of any alleged victim, and the only reasonable inference for the jury was that Ross was shooting over the heads of the victims and, therefore, had no intent to kill.  We disagree.

**B.     Analysis**

T.J. testified that R.D. exchanged words with Ross at the store.  R.D. testified that he did not know who shot at him and that he did not describe the details of the shooting to any officer.  However, Davalos interviewed R.D., and R.D.'s video-taped statement was viewed by the jury.  R.D. described the two individuals he first saw at the store as the individuals who later participated in shooting him.  At that time, he identified the African-American man as having been the shooter and the man's Caucasian companion as the driver of a white Camry.  R.D. explained that he had exchanged words with the individuals and the victims walked a different route back to their motel because they feared the individuals and did not want to encounter them again.  T.J.'s testimony is consistent with R.D.'s statement to Davalos.  The recording from a surveillance camera also corroborates that defendants were at the store at the same time as T.J. and R.D.  Defense evidence shows that Ross checked out of T.J. and R.D.'s motel that morning.

T.J. and R.D. both described that a white Camry was parked on the side of the street when they turned down it and that the vehicle drove up to where they were standing on the sidewalk and stopped in the wrong lane.  T.J. testified that Ross got out the vehicle and shot at them from the vehicle approximately 15 to 20 times without shutting the vehicle's door.  She testified that they were approximately five to 10 feet from the street when Ross started shooting at them.  R.D. told police that Ross got of the vehicle and said, "Fuck you and your kids," before he started shooting at them.  R.D. concluded, based upon Ross's words and actions, that "[he] wanted to hit me or my kids."  R.D. saw bullets hitting the walls and grass.

Officers found 10 casings in the middle of the street where both T.J. and R.D. had said that Ross was standing when he shot at them.  Officers found six strike marks in the nearby buildings, two of which were found in air conditioning units in the bushes and the rest approximately eight to 10 feet from the ground.  Two witnesses from the church

testified that they heard shots and saw a man standing by a white car, identified by Barksdale as a white Corolla or Camry.

Viewing this record in the light most favorable to the judgment, as we are required to do (*People v. Brooks*, *supra*, 3 Cal.5th at p. 57), we conclude a reasonable trier of fact could find beyond a reasonable doubt that Ross acted with intent to kill. That he fired 10 shots (essentially emptying the firearm's magazine of all bullets) at the victims that were approximately five to 10 feet away provides substantial evidence from which the jury could reasonably infer he harbored the intent to kill. " 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill .…" ' " (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.)

Ross argues that "no credible witness" placed any of the victims "down range from the shooter when the shots were fired." However, T.J. testified that Ross fired at her and the other victims and R.D. told Davalos that Ross said, "Fuck you and your kids," which R.D. interpreted to mean that Ross intended to shoot R.D. and his family. "We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

In arguing that R.D. completely lacked credibility and his statement to Davalos cannot be considered as substantial evidence, Ross relies upon *In re I.C.* (2018) 4 Cal.5th 869 for the proposition that determining whether a jury's criminal verdict is supported by substantial evidence requires us to assess the credibility of the witnesses. However, *In Re I.C.* addressed whether substantial evidence supported a juvenile court's jurisdictional finding that was based upon its determination that a child's statements of abuse bore special indicia of reliability. (*Id.* at p. 892.) In that context, the substantial evidence standard applies to " 'whether the child declarant was particularly likely to be telling the truth when the statement was made.' " (*Id.* at p. 891, quoting *Idaho v. Wright* (1990)

41.

497 U.S. 805, 822.)  The context of the case explains why the court's review for substantial evidence there focused upon whether a child victim's statement was reliable.

Ross has failed to provide us with any authority that *In re I.C.* changed prior law that limits our ability to reassess witness credibility when considering the sufficiency of evidence to support a criminal verdict.  "Although the appellate court must ensure the evidence is reasonable in nature, credible, and of solid value [citation], it must be ever cognizant that ' "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' "  (*People v. Barnes* (1986) 42 Cal.3d 284, 303 (*Barnes*).)  We cannot reject the testimony of a witness the trier of fact chose to believe, unless the testimony is physically impossible, or its falsity is apparent without resorting to inference or deduction.  (*Id*. at p. 306.)  "The mere fact that there are contradictions and inconsistencies in the testimony of a witness, or that the truth of his evidence is open to suspicion, does not render it inherently improbable within the meaning of the rule.  It is for the jury to consider such inconsistencies and determine whether they were such as to justify the repudiation of the testimony of the witness in its entirety."  (*People v. Fremont* (1941) 47 Cal.App.2d 341, 349; see *People v. Harris*, *supra*, 57 Cal.4th at p. 849 ["it is the exclusive province of the … jury to determine the credibility of a witness," "[w]e [do not] resolve ... credibility issues"].)

Although an appellate court can overturn a judgment if supporting evidence "was 'inherently improbable,' such a finding is so rare as to be almost nonexistent."  (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728.)  "The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying."  (*Id*. at p. 729.)  On the record here, Ross fails to persuade us that his is so rare a case.  Ross failed to demonstrate, during his trial, that it is physically impossible for him to have shot at the victims, and it is not apparent,

without resorting to inference or deduction, that either T.J.'s testimony or R.D.'s statement to Davalos were false. (See *Barnes*, *supra*, 42 Cal.3d at p. 306.)

Ross also argues that the height of the bullet strikes, being eight to 10 feet from the ground, provides for the reasonable inference that Ross intentionally shot over the heads of the victims and intended only to frighten them. However, T.J. testified that Ross fired the shots at them, R.D. testified that he saw gunshots hitting the grass and walls, and officers found at least two bullet strikes on two air conditioning units behind bushes at ground level, consistent with an attempt to hit the victims. In this case, the evidence shows that the shooting was precipitated by a heated dispute and that Ross and Gaines drove around searching for the victims and then shot at the victims while they were in close range. While Ross argues that he only intended to frighten the victims, another reasonable inference that could be drawn from that evidence is that Ross intended to kill the victims but had poor aim while shooting at them as they fled. (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 945 ["Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind."].) For these reasons, we find unpersuasive Ross's argument that the fact he fired shots at the victims and missed should invalidate the jury's finding of intent to kill.

We similarly reject Ross's argument that the evidence was insufficient to prove the attempted murders were premeditated and deliberate, defined " ' "as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*People v. Burney* (2009) 47 Cal.4th 203, 235, quoting *People v. Jurado* (2006) 38 Cal.4th 72, 118.) " 'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*Jurado*, at p. 118.) "A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting

motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' " (*Id*. at pp. 118–119.)

In this case, Ross and R.D. had a confrontation at the store, Ross said that he would be back as Gaines drove him from the store, defendants were parked on one route that the victims could take back to their motel, defendants immediately pulled from the curb and drove toward the victims when they turned onto the street, and Ross was armed with a firearm. These facts provide substantial evidence to support the jury's finding that the attempted murder of R.D. was premediated and deliberate.

We conclude that sufficient evidence supports defendants' conviction of attempted deliberate and premeditated murder.

## IV. Ross's conviction for criminal threats was supported by sufficient evidence.

### A. Background

R.D. testified that neither Ross nor Gaines threatened R.D. or T.J. He also testified that he could not remember telling Davalos that one of the individuals got out of the vehicle and said, "Fuck you and your kids," before shooting at the victims. However, Davalos testified that he interviewed R.D. right after the shooting, and the video of the interview shows that R.D. told Davalos that just before shooting, Ross said, " 'Fuck you and your kids,' " and R.D. believed that "[Ross] wanted to hit [R.D.] or [his] kids." This statement was the basis for count 8, which charged Ross with making a criminal threat. Ross argues that substantial evidence does not support his conviction because R.D.'s prior inconsistent statement alone cannot form the basis of a conviction without corroboration and because R.D. completely lacked credibility. Ross also argues that the verbal statement alone does not communicate a threat and the jury could not consider the circumstances in which Ross made the statement in determining whether the verbal statement was a criminal threat. We reject both arguments.

44.

**B.     Applicable Law and Standard of Review**

"In order to prove a violation of section 422, the prosecution must establish all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement … is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, … so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances."  (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228; see § 422, subd. (a).)

Moreover, "a threat made through nonverbal conduct falls outside the scope of section 422 as currently written."  (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1147 (*Gonzalez*) [§ 422 not violated by the defendant communicating a threat by making a gang hand sign and manually simulating a pistol pointed upward].)  "A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning."  (*In re George T.* (2004) 33 Cal.4th 620, 635, citing with approval *People v. Butler* (2000) 85 Cal.App.4th 745, 753–754 ["[I]t is the circumstances under which the threat is made that give meaning to the actual words used.  Even an ambiguous statement may be a basis for a violation of section 422."]; see *People v. Bolin* (1998) 18 Cal.4th 297, 340.)

C.    **Analysis**

      1.    *Ross's conviction can be based upon evidence introduced as a prior inconsistent statement.*

As support for his argument that a repudiated out-of-court statement alone is insufficient to convict him, Ross relies on language in *People v. Montiel* (1993) 5 Cal.4th 877 (*Montiel*), disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, footnote 13.  In *Montiel*, at the penalty phase of a capital case, statements the defendant's family members made to police officers concerning prior incidents of the defendant's violence were admitted at trial.  (*Montiel*, at p. 902.)  The family members repudiated the statements in their testimony at the penalty trial.  (*Ibid*.)  Our Supreme Court concluded that the defendant had forfeited his argument that the extrajudicial statements were inadmissible and insufficient to prove he committed the crimes against his family members.  (*Id*. at p. 928.)

However, the court also recognized that an extrajudicial statement repudiated at trial cannot form the sole basis for a conviction because where only a single witness's extrajudicial statement has been repudiated under oath, the extrajudicial statement lacks the " ' "traditional indicia of reliability," ' " which attach to an accusation made under oath and are subject to cross-examination in a formal judicial proceeding.  (*Montiel*, *supra*, 5 Cal.4th at p. 929.)  *Montiel* relied on *In re Miguel L.* (1982) 32 Cal.3d 100 and *People v. Gould* (1960) 54 Cal.2d 621 (*Gould*),[29] which involved repudiation of a witness's extrajudicial identification of the defendant as the perpetrator of the crime.

After the decision in *Montiel*, our Supreme Court overruled *Gould*, to the extent it held "that an out-of-court identification is in all cases insufficient by itself to sustain a conviction and must be corroborated by other evidence linking the defendant to the crime."  (*Cuevas*, *supra*, 12 Cal.4th 252 at pp. 271–272.)  Instead, the substantial evidence test set forth in *People v. Johnson* (1980) 26 Cal.3d 557, 578, should be used to

[29]    Both cases have now been overruled on this ground by *People v. Cuevas*, (1995) 12 Cal.4th 252, 271–272 (*Cuevas*).

determine whether an out-of-court identification is sufficient to support a criminal conviction. (*Cuevas*, at p. 272.)

The *Cuevas* court's discussion of *Gould* indicated the court did not view the rule set out in *Gould*—that a repudiated out-of-court identification is insufficient for conviction without corroboration by other evidence—as a rule applicable to other types of extrajudicial evidence. (*Cuevas*, *supra*, 12 Cal.4th at pp. 263–266.) It stated: "[T]here is no logic to requiring corroboration of out-of-court identifications, but not of other types of hearsay that might be offered as evidence of guilt." (*Id*. at p. 265.) "Logically, therefore, out-of-court identifications and other *out-of-court statements* should be measured by the same standard in judging their sufficiency to support a conviction. The *Gould* corroboration requirement goes against this logic, for while it prohibits in all cases the use of an out-of-court identification as the sole evidence of guilt, other types of out-of-court statements may serve as the sole evidence of guilt if they satisfy the substantial evidence test." (*Id*. at p. 266, italics added.) *Cuevas* essentially concluded repudiated out-of-court identifications should be treated like other repudiated out-of-court statements, which are admissible without corroboration, weighed by the jury along with all the other evidence presented, and tested by the substantial evidence standard on appeal.[30]

Consistent with *Cuevas*, we conclude the repudiated extrajudicial statements of R.D. that were admitted as prior inconsistent statements were sufficient without corroboration to form the basis of Ross's conviction if the evidence against him otherwise meets the substantial evidence test. "Under [the substantial evidence test], the court 'must review the whole record in the light most favorable to the judgment below to

---

[30] Our Supreme Court has since characterized *Montiel*'s comments regarding the legal insufficiency of a prior inconsistent statement, standing alone, as suggested "based on a holding in [*Gould*, *supra*,] 54 Cal.2d [at page] 631, that we have since overruled." (*People v. Chhoun* (2021) 11 Cal.5th 1, 44, fn. 19.) "We need not decide whether *Montiel*'s observations have continuing vitality because significant evidence beyond [the witness's] statement implicated [the] defendant in the … crimes." (*Id*. at p. 45, fn. 19.)

determine whether it discloses *substantial evidence*—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*Cuevas*, *supra*, 12 Cal.4th at pp. 260–261.)

In this case, the evidence shows that defendants and the victims encountered each other at the store, R.D. and defendants exchanged heated words, defendants drove into the wrong lane close to where the victims were later walking, Ross exited the vehicle with a firearm, and R.D. heard Ross say, "Fuck you and your kids," leading R.D. to believe that Ross meant to shoot at the victims and causing them to flee in fear of being shot. We conclude that the evidence was sufficient for a jury to conclude that Ross willfully threatened to shoot the victims, intended that the victims perceive his statement to be such a threat, his statement was verbal and, on its face and in relation to the circumstances in which it was made, was so unequivocal, unconditional, immediate, and specific as to convey to the victims that Ross intended to shoot them, and that the victims reasonably and actually feared for their safety. (See *People v. Toledo*, *supra*, 26 Cal.4th at pp. 227–228.)

Ross argues that R.D.'s credibility is too questionable to be considered substantial evidence. As we previously discussed *ante*, in part III.B., we cannot resolve issues of credibility. (See *Young*, *supra*, 34 Cal.4th at p. 1181.) We note, however, "that juries are capable of determining the credibility of out-of-court statements that are inconsistent with a witness's trial testimony by observing the witness's in-court demeanor: 'If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of the words uttered under oath in court.' " (*Cuevas*, *supra*, 12 Cal.4th at p. 273.) Although an appellate court can overturn a judgment if supporting

evidence "was 'inherently improbable,' " (*People v. Ennis*, *supra*, 190 Cal.App.4th at p. 728), on the record here, Ross fails to persuade us that his is so rare a case. Ross failed to demonstrate that it is physically impossible for him to have threatened R.D. and it is not apparent, without resorting to inference or deduction, that R.D.'s statement to Davalos was false.[31] (See *Barnes*, *supra*, 42 Cal.3d at p. 306.)

Therefore, we do not address whether substantial evidence supported the jury's determination that R.D.'s statement to Davalos was credible. Sufficient evidence supports the jury's verdict, including R.D.'s statement to Davalos that Ross said, "Fuck you and your kids," before shooting at the victims.

### 2. Evidence of Ross's statement and the surrounding circumstances in which it was made support his conviction of criminal threats.

Ross also argues that the evidence was insufficient to support his conviction for a criminal threat because the jury used his pointing a gun at the victims, and nonverbal conduct cannot be the basis of a conviction under section 422. Ross contends that the evidence at trial established only that he made a threat through nonverbal conduct—displaying and manipulating his gun—and this conduct communicated to the victims that he intended to shoot them, but that without the use of the gun, his statement to R.D. did not convey a threat.

We agree that Ross's statement, "Fuck you and your kids," is not so unequivocal as to have conveyed that he intended to shoot the victims if heard in isolation. However, our Supreme Court has previously explained that the surrounding circumstances of the

---

[31]    R.D. made his statement to Davalos shortly after the shooting and before police had located his girlfriend or her children. The jury could have concluded that R.D.'s description of the events made so close in time to the shooting were reliable since he was likely still excited from the events. (See Evid. Code, § 1240, subd. (a) [spontaneous statement exception to the hearsay rule applicable where statement describes an act perceived by declarant while under the stress of excitement caused by the perception]; *People v. Farmer* (1989) 47 Cal.3d 888, 905, ["Where the declarant is truly excited and makes a statement about a concurrently or recently perceived event before having the opportunity to think through the possible consequences of his utterance, it is likely to be a reliable statement."], disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

statement may clarify facial ambiguity. (*In re George T.*, *supra*, 33 Cal.4th at p. 637, citing with approval *People v. Butler*, *supra*, 85 Cal.App.4th at pp. 753–754.) *Butler* held that "the meaning of the threat by [a] defendant must be gleaned from the words and all of the surrounding circumstances." (*Butler*, at p. 753.) "Thus, it is the circumstances under which the threat is made that give meaning to the actual words used." (*Ibid.*; see *id.* at p. 749 [finding a threat based on the defendant's statement to the victim that she needed to mind her own business or she " 'was going to get hurt,' " coupled with his conduct].)

Section 422 requires that the threat be conveyed by a "statement, made verbally, in writing, or by means of an electronic communication device." (§ 422.) Based on this statutory language, courts have required a threat charged under section 422 to include some words or sound to qualify as a "statement, made verbally." (*Gonzalez*, *supra*, 2 Cal.5th at p. 1140.) In *Gonzalez*, our Supreme Court reversed a threat conviction where the defendant communicated the threat only by making a gang hand sign and "manually simulated a pistol pointed upward." (*Ibid.*) Ross argues that pursuant to *Gonzalez*, whether a statement conveys a criminal threat can only be determined on the face of the verbal statement alone. We reject his argument that *Gonzalez* has overruled the case law in this area.

Evidence Code section 225 defines "statement" as a communication made either verbally or by nonverbal conduct. After reviewing the legislative history of section 422, *Gonzalez* concluded that the Legislature "(a) was aware that the 'made verbally' language excluded nonverbal conduct, and (b) intended that nonverbal conduct may qualify as a statement under [Penal Code sections] but not section 422." (*Gonzalez*, *supra*, 2 Cal.5th at pp. 1145–1146.) Accordingly, "a threat made through nonverbal conduct falls outside the scope of section 422." (*Id.* at p. 1147.) Notably, however, the threat charged in *Gonzalez* did not include *any* verbal statement, and our Supreme Court did not address the historical case law involving ambiguous verbal statements. *Gonzalez* did not overrule

50.

or reject its prior decisions permitting consideration of surrounding circumstances in determining whether a verbal statement was a criminal threat under section 422.

Here, R.D. told Davalos that Ross had a gun in his hand when he said, "Fuck you and your kids," before firing at the victims. Unlike the situation in *Gonzalez*, Davalos's testimony and the video recording of R.D.'s statement did not describe purely nonverbal conduct: It described a nonverbal threat accompanied by a verbal statement. While nonverbal conduct alone is insufficient to constitute a criminal threat, a combination of words and gestures may be sufficient. (*People v. Culbert* (2013) 218 Cal.App.4th 184, 190.) The defendant in *Culbert* argued his words—" 'Don't lie to me,' " and, " 'Don't call me that,' "—did not implicitly or explicitly threaten to inflict great bodily injury or death and therefore did not constitute criminal threats. (*Ibid*.) But the words were uttered while the defendant was holding a gun to his stepson's head. "Few objects are as inherently threatening as a firearm, especially when it is pressed to one's head. The only rational inference, taking into account the entire context in which these statements were made, is that [the defendant] was threatening to harm [his stepson] if [the stepson] ever again lied or called him names. [The defendant] did not need to add a phrase like 'or else,' or 'I'm going to kill you,' to make his statements threatening. The firearm pressed against [the stepson's] temple accomplished that result." (*Ibid*.)

Similarly, here, Ross's statement, made at gunpoint, communicated to R.D. that he intended to shoot R.D., his girlfriend, and her children—i.e., that he would "commit a crime which will result in death or great bodily injury" (§ 422), and harm them in a drive-by shooting. Ross's words and his actions conveyed a "gravity of purpose and an immediate prospect of execution of the threat" that resulted in the victims running from him in fear, as required by section 422. Substantial evidence supports the conviction.

## V. Remand is necessary for resentencing in accordance with section 1170, as amended by Senate Bill No. 567.

Gaines and Ross argue that their cases must be remanded for resentencing because of recent amendments to section 1170. They contend that because their case is not yet final on appeal, they are entitled to the benefit of section 1170, as amended, pursuant to the principles of retroactivity set forth in *In re Estrada* (1965) 63 Cal.2d 740. The People agree that we should remand the matter for resentencing and permit the trial court to reconsider its sentencing choices under the recent amendment. We accept the People's concession.

The trial court sentenced Gaines and selected the middle term sentence. The trial court also sentenced Ross but selected the upper term sentence. Effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567)[32] amended section 1170 to include a presumption in favor of the lower term sentence when a defendant is under 26 years of age at the time of the offense, unless the court finds that the aggravating circumstances outweigh the mitigating circumstances. (§§ 1170, subd. (b)(6)(B) [amended by Stats. 2021, ch. 731, § 1.3], 1016.7, subd. (b) [added by Stats. 2021, ch. 695, § 4].) Here, because defendants were under 26 years old at the time of the offense, it is possible their age "was a contributing factor in the commission of the offense" that may require imposition of the lower term. (§ 1170, subd. (b)(6).)

Additionally, section 1170 was amended to require a court to "order imposition of a sentence not to exceed the middle term," except under narrow circumstances. (§ 1170,

---

[32] Three bills amending section 1170 were enacted and signed into law on the same date during the 2021–2022 Regular Session: Senate Bill 567 (Stats. 2021, ch. 731, § 1.3); Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5); and Assembly Bill No. 1540 (Stats. 2021, ch. 719, § 2). Senate Bill 567 takes precedence over the other two because it bears the highest chapter number and was enacted last. (Gov. Code, § 9605, subd. (b); *In re Thierry S.* (1977) 19 Cal.3d 727, 738–739, superseded by statute on another ground as stated in *In re Gregory S.* (1980) 112 Cal.App.3d 764, 772.) Senate Bill 567 states that if all three bills amending section 1170 are enacted and become effective on or before January 1, 2022, and Senate Bill 567 is enacted last, then section 1.3 of that bill, which incorporates the amendments proposed by all three bills, shall become the operative law. (Stats. 2021, ch. 731, § 3.)

subd. (b)(1).)  An upper term may be imposed when justified by aggravating circumstances and the facts underlying those circumstances have been stipulated to by the defendant or found true by a jury or by the judge in a court trial.  (*Id.*, subd. (b)(2).) However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (*Id.*, subd. (b)(3).)  Ross was sentenced to the upper term based on his violent conduct that indicated a serious danger to society, his numerous and increasingly serious prior convictions as an adult, being on two grants of misdemeanor probation at the time of the offense, and his unsatisfactory performance on probation.  In part, the upper term sentence was not based on "facts … stipulated to by the defendant, or … found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial," as required under the amended statute.  (§ 1170, subd. (b)(2).)

Our Supreme Court has held, when a court is unaware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  After reviewing the trial court's comments and sentence in this case, we are unable to conclude that the court would not exercise its discretion to impose different sentences.

We will therefore remand the matter for resentencing under section 1170, as amended by Senate Bill 567.  (Stats. 2021, ch. 731, § 1.3.)[33]

---

[33]  Gaines also argues that recent amendments to section 654 require resentencing.  Ross further argues that he is entitled resentencing based upon (1) section 1385, subdivision (c)(2)(B), which now requires a trial court to dismiss all but one of multiple sentencing enhancements, (2) *People v. Tirado* (2022) 12 Cal.5th 688, which now permits a trial court to exercise its discretion to impose a lesser firearm enhancement, and (3) the trial court's failure to determine his ability to pay before imposing fines, fees, and assessments.  Because we accept the People's concession that Gaines and Ross are entitled to resentencing pursuant to section 1170, as amended by Senate Bill 567, we conclude it is unnecessary to reach these additional arguments as they are moot and defendants may raise them at resentencing.  (See *People v. Valenzuela*

## DISPOSITION

The sentences are vacated, and the matters are remanded to the trial court for resentencing in accordance with section 1170, as amended by Senate Bill 567. (Stats. 2021, ch. 731, § 1.3.)  The judgments are otherwise affirmed.  Following resentencing, the trial court clerk shall prepare amended abstracts of judgment and forward certified copies to the Department of Corrections and Rehabilitation.


                                                                                        HILL, P. J.
WE CONCUR:


LEVY, J.


DE SANTOS, J.

---

(2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BRANDON MICHAEL GAINES,<br><br>Defendant and Appellant. | F083168<br><br>(Kern Super. Ct. No. BF182466A)<br><br>**ORDER GRANTING REQUEST FOR PUBLICATION** |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DONTAY LARRY ROSS,<br><br>Defendant and Appellant. | F083228<br><br>(Kern Super. Ct. No. BF182466B) |

As the nonpublished opinion filed on June 15, 2023, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), the request for publication filed on July 3, 2023, is hereby granted, and it is ordered that the opinion be certified for publication in the Official Reports.

HILL, P. J.

WE CONCUR:

LEVY, J.

DE SANTOS, J.